IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| NOVELLA CASADY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:08CV103-SRW |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Novella Casady brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

On January 23, 2006, plaintiff filed an application for disability insurance benefits, alleging that she became disabled on December 1, 2002. On May 21, 2007, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on July 3, 2007, in which he found that through plaintiff's date last insured – December 31, 2002 – she did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for

twelve consecutive months and, accordingly, she did not have a "severe" impairment or combination of impairments and was not under a disability as defined in the Social Security Act. On January 28, 2008, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The Commissioner's regulations prescribe a five-step "sequential evaluation process" for evaluating claims of disability. 20 C.F.R. §§ 404.1520, 916.920.

> At the first step, the claimant must prove that she has not engaged in substantial gainful activity. At the second step, she must prove that she has a severe impairment or combination of impairments. If, at the third step, she proves that her impairment or combination of impairments meets or equals a listed impairment, she is automatically found disabled regardless of age, education, or work experience. If she cannot prevail at the third step, she must proceed to the fourth step where she must prove that she is unable to perform her past relevant work. At the fifth step, the burden shifts to the Commissioner to determine if there is other work available in significant numbers in the national economy that the claimant is able to perform. If the Commissioner can demonstrate that there are jobs the claimant can perform, the claimant must prove she is unable to perform those jobs in order to be found disabled.

Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999)(citations omitted). The Commissioner follows the steps in this "set order" and, if the Commissioner can find that a claimant is disabled or is not disabled at any step, the Commissioner "make[s] [his] determination or decision and . . . [does] not go on to the next step." 20 C.F.R. § 404.1520(a)(4), § 416.920(a)(4).

As noted above, the ALJ determined – at Step 2 – that plaintiff was not disabled before her date last insured. "At the second step of the five-step analysis, the claimant bears the burden of proving that she has a severe impairment or combination of impairments." O'Bier v. Commissioner of Social Security Administration, 2009 WL 1904706, 1 (11th Cir. Jul 2, 2009).

> An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a); Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir.1997). "Basic work activities" include: physical functions such as walking, standing, sitting, lifting, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). An impairment is not severe only if the

> abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir.1986). It is a threshold inquiry where only the most trivial impairments are rejected. Id. "The claimant's burden at step two is mild." Id.

Id. Plaintiff contends that the ALJ erred in his Step 2 analysis by: (1) failing to consider her obesity; and (2) by finding that she had failed to meet her "mild" burden of demonstrating that her medically determinable impairments "rise above slight abnormalities that produce greater than minimal effects on her ability to work." (Doc. # 11, pp. 10-14).

As plaintiff argues, the ALJ did not use the word "obesity" in his decision. Plaintiff cites page 345 of the administrative transcript, a January 2002 treatment note which shows plaintiff's weight to be 250.5 pounds, in which plaintiff's physician, Dr. Butler, described plaintiff – in the section of his treatment notes pertaining to the physical examination – as an "[o]bese w.f. appearing the stated age." (Exhibit 12F, p. 35).[1] In January 2003, seventeen days after plaintiff's date last insured, Dr. Butler described plaintiff as a "[w]ell nourished, well developed, obese w.f. appearing the stated age." (Exhibit 12F, p. 14). Plaintiff's weight fell below 200 pounds in early 2006 (See Exhibit 1F, pp. 3, 6); before this point, treatment notes consistently reflected her weight to be well above 200 pounds. While Dr. Butler did not include "obesity" in the diagnoses he listed in the assessment section of his notes (see Exhibit 12F) he did, before plaintiff's date last insured, speak with her about her weight, exercise program, dietary changes, and weight loss. See Exhibit 12F, p. 40 (11/21/00), p. 20 (8/5/02), p. 17 (10/31/02).

---

[1] Plaintiff's height is 66 or 67 inches. (Exhibit 9F, p. 13; hearing testimony at R. 30).

4

The ALJ did not include obesity in the list of plaintiff's medically determinable impairments. (Finding No. 3, R. 15). As noted *supra*, Dr. Butler described plaintiff as "obese" but did not make an express diagnosis of "obesity." (See Exhibit 12F). Plaintiff's weight and Dr. Butler's reference to plaintiff as "obese" do not evidence a resulting limitation on plaintiff's ability to function. The ALJ's decision expressly notes that Dr. Butler spoke with plaintiff about "dietary changes" on August 5, 2002, and that he spoke with her about "exercise and weight loss" on October 31, 2002. (R. 18). Thus, the opinion as a whole reflects that the ALJ was aware of and considered the evidence regarding plaintiff's weight, as he was required to do, in evaluating her claim of disability. Under these circumstances, the court concludes that the ALJ's failure to include "obesity" as one of plaintiff's medically determinable impairments in stating his Step 2 conclusion does not constitute error.[2]

Plaintiff's second allegation of error is that the ALJ erred in applying the severity standard, because "the evidentiary record reveals that Ms. Casady's medically determinable impairments should not be classified as trivial" and because she "has met her *mild* burden of proof, by presenting evidence that shows her medically determinable impairments rise above slight abnormalities that produce greater than minimal effects on her ability to work." (Doc. # 11, pp. 12-13)(emphasis in original). Plaintiff points to a number of symptoms she

---

[2] Even if it were error, it is harmless given the lack of evidence that plaintiff suffered any functional limitation during the relevant period as a result of her weight. See Aragon v. Astrue, 246 Fed. Appx. 546, 548 (10th Cir. 2007)("'[T]he mere presence of a condition is not sufficient to make a step-two showing.' The claimant must show at step two that his condition significantly limits his ability to do basic work activities.")(citations omitted).

experienced before the expiration of her insured status, specifically, continued problems with her arms which caused Dr. Butler to prescribe hand splints and ultimately to administer trigger point injections, upper and lower extremity pain, and swelling in her lower extremities. Id. at 13.

Plaintiff's argument misses a critical point. The ALJ concluded that "the claimant did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for 12 consecutive months; therefore the claimant did not have a severe impairment or combination of impairments." (Finding No. 4, R. 15; see also R. 18 (noting that plaintiff's impairments were not shown to have caused work-related limitations for a continuous period of twelve months)). The Step 2 analysis is two-fold. Plaintiff must establish both that her impairment or combination of impairments is medically "severe," *i.e.*, that it significantly limits her ability to do basic work activities (see 20 C.F.R. § 404.1521) *and* that her "severe" impairment or combination of impairments lasted "for a continuous period of at least 12 months" (20 C.F.R. § 404.1509).[3] See 20 C.F.R. § 404.1520(a)(4)(ii)("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment *that meets the duration requirement in § 404.1509*, or a combination of impairments that is severe *and meets the duration requirement*, we will find that you are not

---

[3] A finding of disability may be based on a conclusion that a severe impairment or combination of impairments can "be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1520. In this Title II case, however, plaintiff filed her application more than three years after her insured status expired. Accordingly, at the time of adjudication, the ALJ was in a position to evaluate whether plaintiff had a severe impairment or combination of impairments which actually lasted the requisite twelve months.

disabled.")(emphasis added); see also Zaccaria v. Commissioner of Social Security, 267 Fed. Appx. 159, 161 (3rd Cir. 2008)("To satisfy step two, Zaccaria was required to demonstrate that . . . by September 30, 1995, he had suffered a severe impairment or combination of impairments which lasted or could be expected to last for twelve months[.]"); Aragon, 246 Fed. Appx. at 550 (quoting, with approval, ALJ's statement that claimant's depression was not severe because, "'while the claimant since mid-2001 has intermittently exhibited signs and symptoms of depression or a severe depressive disorder, the record fails to document an impairment that has existed or been observed for 12 continuous months at a level that would more than minimally affect the claimant's ability to work.'"); Delavan v. Astrue, 2008 WL 2816073, 2 (M.D. Fla. Jul 21, 2008)("The issue of whether the plaintiff has a severe impairment arises in step two of the Commissioner's sequential analysis and is thus something of a threshold inquiry. The threshold, however, becomes higher where, as here, there is a question whether the plaintiff can show that her impairment was severe for at least twelve months. Thus, at step two a claimant, in order to proceed further in the sequential analysis, must show not only that she has a severe impairment but that her impairment meets the durational requirement of a continuous period of at least twelve months.").

    In November of 2000, Dr. Butler was treating plaintiff for hypertension, hypothyroidism and electrolyte imbalance. His treatment note indicates that plaintiff "has been feeling a good bit better with the Paxil and medication now. Dr. Butler's office called in a prescription for plaintiff's thyroid medication in August 2001; otherwise she did not seek treatment from him again until January 2002, more than thirteen months later. At that time,

she complained that she was having "multiple problems now with thyroid, weight gain, depression, arm and other problems." She stated that she wanted to "try something other than Paxil." Dr. Butler's assessments included hypertension, high risk medication, hyperlipidemia, hypothyroidism, probable carpal tunnel syndrome, knot in the right arm, goiter and gout. He prescribed a splint for the carpal tunnel syndrome, observing that "pt does nails and has for 6 years[,]" and, while he did not specifically diagnose depression, he prescribed Wellbutrin, which is indicated for treatment of major depressive disorder.[4] Plaintiff returned to Dr. Butler one month later, complaining of "trouble with [her] arm and BP." He ordered a thyroid ultrasound for the goiter, which was found to be "acceptable," and "seem[ed] to be a fat pad." He ordered an ultrasound of the knots in plaintiff arms and found them to be lipomas.[5] He offered to arrange to have the lipomas excised, but plaintiff declined. He again advised her to use splints for carpal tunnel syndrome. Dr. Butler's office called in another prescription for Wellbutrin on April 12, 2002. On June 19, 2002, plaintiff complained that her right foot "swells [at] times." Dr. Butler diagnosed "leg pain with venous stasis," hypothyroidism, hyperlipidemia, high risk medication, and edema of the legs. On July 1, 2002, plaintiff reported "mild leg pain and swelling at times," but also indicated that her "legs do feel better and BP is doing better too." On examination, she had right leg edema. Dr. Butler ordered venous imaging, which showed an "incompetent valve involving the right greater saphenous vein, with mild venous insufficiency involving the right leg."

---

[4] Physician's Desk Reference at p. 1649 (63rd ed. 2009).

[5] A lipoma is "[a] benign neoplasm of adipose tissue, comprised of mature fat cells." Stedman's Medical Dictionary at p. 986 (26th ed. 1995).

8

One month later, on August 5, 2002, plaintiff had edema of her legs bilaterally, but "[d]enied any pain in the legs" and declined to use below-the-knee compression stockings. Dr. Butler's assessment included edema, hypertension, high risk medications and menopausal syndrome. In October 2002, Dr. Butler's office called in another prescription for Wellbutrin. On October 31, 2002, plaintiff complained only of "problems with night sweats" and her weight. She reported that she had stopped her Premarin[6] but that it had not made any difference. She had no peripheral edema. Dr. Butler diagnosed heat intolerance, hypomagnesemia, menopausal syndrome, high risk medication, hypertension, hyperlipidemia, and electrolyte imbalance. Plaintiff did not again seek medical treatment from Dr. Butler before December 31, 2002, her date last insured.

On January 17, 2003, plaintiff reported to Dr. Butler that she was having neck pain, and "pain in the hands when she holds her hands up." He noted, "Pt is a nail technician and uses her hands a lot in repetitive motion but doesn't sound like a classic carp[a]l tunnel syndrome but this has been the differential diagnosis. Pt has knots in the arms too that we have done [ultrasound] of before that looks like fatty tumors and does seem to be getting bigger." Again, she had no peripheral edema. Dr. Butler diagnosed cervical pain, high risk medication and hand pain. He prescribed Ultram and Naprosyn. On February 18, 2003, plaintiff returned to Dr. Butler. The treatment note indicates that she "has been having a lot of problems with fibrocytis type pain in the upper part of the portions of the arms bilaterally," and "also a bilateral hand numbness at times." She reported that she had worn the splints but

---

[6] Premarin is an estrogen treatment. Physician's Desk Reference at p. 3220.

9

that they "[d]idn't really help."  She reported that her neck pain was "some better but continues to have problems."  Dr. Butler changed plaintiff's Naprosyn prescription to Bextra and referred her for nerve conduction studies due to the possible carpal tunnel syndrome.  On March 11, 2003, plaintiff reported continued arm pain and "some numbness," and Dr. Butler administered trigger point injections for the fibrocytis.  On April 4, 2003, plaintiff reported to Dr. Butler's office seeking injections into her upper arms for fibrocytis pain, stating that she was still having a lot of problems with her arms and hands.  Dr. Butler gave her the injections and advised her to use heat and deep heating cream.  Dr. Butler's office called in a prescription for Wellbutrin on April 10, 2003. (Exhibit 12F).

Dr. Clark Metzger evaluated plaintiff on April 15, 2003.  She told him that she had numbness at night when her elbows were flexed, cramping in the left thumb when she overuses the hand, and "some shoulder pain, particularly when she is doing something such as folding laundry, etc. with her arms out in a forward flexed position."  Dr. Metzger concluded that "the bulk of the patient's upper extremity numbness is actually created by ulnar nerve tension with her elbows flexed."  Dr. Metzger stated:

> This is not enough for me to consider surgical intervention and I do not think this type of nighttime hand numbness will improve with carpal tunnel release, though she does have positive EMG and nerve conduction velocities.  She also has what I believe to be a small flexor tendon sheath ganglion of the left middle finger towards the MP joint, but again, this is not symptomatic.  I also believe her to have bilateral rotator cuff impingement/tendonitis and for that we're going to start her in a physical therapy program.

He gave plaintiff a prescription for a left elbow extension splint to wear at night, noting that he did not think she would tolerate wearing them bilaterally.  (Exhibit 11F).

Although Dr. Butler's notes indicate his office called in prescriptions for the plaintiff, she did not visit him again until November 20, 2003, more than seven months after her previous office visit and her evaluation by Dr. Metzger. She reported "I'm doing pretty well." She had no peripheral edema. The office note does not indicate any complaints of neck, shoulder, leg or hand pain. (Exhibit 12 F).[7]

In her brief, plaintiff does not analyze the evidence regarding her allegation of depression,[8] but emphasizes the term – twice, in bold type – suggesting that she believes it to be significant to her appeal.[9] (Doc. # 11, pp. 2, 8). The court does not agree. The record includes no evidence of treatment by a mental health professional. Before her date last insured, plaintiff reported problems with depression only once, in January 2002 – eleven months before her alleged onset date – requesting that Dr. Butler prescribe a medication other than Paxil.[10] Dr. Butler changed her medication to Wellbutrin. He continued to prescribe Wellbutrin, and there is no indication in the record that plaintiff exhibited any

---

[7] Much of the medical record pertains to plaintiff's treatment for chronic back pain in 2005 and 2006, and plaintiff's treatment for a T-12 compression fracture after she fell from her porch in June 2006. See Exhibits 2F, 4F, 5F, 6F, 7F.

[8] Plaintiff did not allege depression as a basis for disability in her application, but testified at the administrative hearing that she has been diagnosed with depression which causes her problems, and that her testimony regarding her "present-day conditions" were consistent with "how [she was] doing back in December of 2002." (R. 38-39)(Plaintiff testified that, because of her depression, "I don't want to talk to anybody, I don't go anywhere, I very seldom even answer the phone, I'll just sit and watch it ring."); R. 82 (alleging, in disability report, that she is disabled due to "[f]ibromyalgia and deteriorating disk in lower back").

[9] The court has reviewed and considered the entire medical record but discusses only those impairments which plaintiff suggests as a basis for her argument that the ALJ's Step 2 analysis was flawed.

[10] While plaintiff likely voiced complaints of depression or anxiety before she received the prescription for Paxil, there is no evidence in the record regarding earlier mental health treatment.

symptoms of depression at any time thereafter before her date last insured, let alone any symptoms imposing work-related limitations.[11]

Plaintiff also points to the evidence that she suffered from leg pain, venous insufficiency and edema of the lower extremities and that, on August 5, 2002, she reported that she was experiencing swelling in her lower extremities on a daily basis. (Doc. # 11, p. 13-14). Plaintiff's first complaint of lower extremity swelling was on June 19, 2002, when she reported that her right foot swelled "at times." Her lower extremity edema persisted through her office visit in August 2002. In the August visit, while she complained of swelling "on a daily basis," she denied any leg pain and declined to use compression stockings. On October 31, 2002, plaintiff voiced no complaint regarding her legs and examination revealed no peripheral edema. Plaintiff sought no other treatment for lower extremity swelling before or after her date last insured. Office treatment notes specifically note no peripheral edema in January and November 2003. The medical record substantiates problems with plaintiff's leg pain, venous insufficiency and lower extremity edema between mid-June 2002 and, at the latest, October 2002.

Plaintiff further argues that "prior to the expiration of her insured status [she] experienced continued problems with her arms[.]" (Doc. # 11, p. 13). Plaintiff complained of problems with her arms in January and February 2002; on both occasions, Dr. Butler

---

[11] In May 2006, plaintiff completed a medical history form on which she did not indicate any history of treatment for depression. (R. 242). When plaintiff visited Dr. Jeff Buchalter on July 13, 2006 for pain management treatment, he recorded her psychiatric medical history as "Negative depression, negative anxiety[.]" (R. 283).

12

recommended wrist splints for carpal tunnel syndrome.[12] Plaintiff did not again complain of problems with her arms until January 2003, after her date last insured. She sought treatment for her arm, hand and shoulder in February, March and April 2003, and did not again seek medical treatment (other than medications) until November 2003, when she reported that she was "doing pretty well" and voiced no complaints of arm or hand problems. Plaintiff sought treatment in Dr. Butler's office in April, June, August, and October 2002, but the treatment notes do not indicate that plaintiff voiced any complaint about her arms or hands during those examinations. Thus, from the time of plaintiff's February 1, 2002 complaint of "trouble with [her] arm" until her January 17, 2003 complaint of "pain in the hands when she holds her hands up" – a period of almost one year – plaintiff did not indicate problems with her arms or seek treatment for them. Plaintiff suggests that workplace limitations should be inferred from the trigger point injections in March and April 2003 and Dr. Butler's "choice also to administer hand splints in an attempt to improve [plaintiff's] symptomatology[.]" (Doc. # 11, p. 13).[13] However, even assuming that the evidence is sufficient to establish that plaintiff's arm and/or hand problems were medically severe, plaintiff was required also to demonstrate that these impairments (or her combination of impairments), which were manifested before her date last insured, persisted at a severe level for a *continuous* period of twelve months. 20 C.F.R. § 404.1509. The ALJ did not err by concluding that she had failed to do so.

---

[12] Plaintiff's arm problems also included the lipomas; there is no indication of any functional limitations caused by the lipomas.

[13] No functional limitations are expressly noted in the medical record.

13

## CONCLUSION

Upon review of the record as a whole, the court concludes that the ALJ's finding that plaintiff did not have, before her date last insured, a "severe" impairment or combination of impairments that "significantly limited her ability to perform basic work-related activities for 12 consecutive months" is supported by substantial evidence and a proper application of the law. Accordingly, the decision of the Commissioner is due to be AFFIRMED. A separate judgment will be entered.

Done, this 24th day of September, 2009.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE